UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| JOSE LUIS AJIATAS-SOLVAL;<br>RODOLFO CALDERON-GOMEZ;<br>NELSON GONZALO CARRILLO-CHAY;<br>JOSE MANUEL RUIZ-TUM;<br>and FUDENCIO RUIZ-TUM<br><br>Plaintiffs,<br><br>vs.<br><br>CISCO PRODUCE, INC.;<br>and DAVID FRANCISCO-BALTAZAR,<br>d/b/a "CISCO PRODUCE";<br><br>Defendants. | Civil Action No.   1:14-CV-197(WLS) |

**COMPLAINT**

**PRELIMINARY STATEMENT**

1.     Plaintiffs Jose Luis Ajiatas-Solval, Rodolfo Calderon-Gomez, Nelson Gonzalo

Carrillo-Chay, Jose Manuel Ruiz-Tum, and Fudencio Ruiz-Tum are five Hispanic men of

Guatemalan national origin who were brought from rural Guatemala to the United States to work

for Defendants. As soon as they arrived in Georgia, Defendants forced them to work under the

threat of deportation and subjected them to repeated verbal abuse and threats. Defendants' threats

caused Plaintiffs to fear leaving their employment and to fear raising claims about their

treatment.

1

2.      Plaintiffs bring actions to vindicate their rights under the Trafficking Victims Protection Act of 2008, Title VII of the Civil Rights Act of 1964, and the Fair Labor Standards Act.

## JURISDICTION

3.      This Court has jurisdiction of this action pursuant to:

        a.      28 U.S.C. § 1331 (Federal Question);

        b.      28 U.S.C. § 1343 (Title VII/Civil Rights);

        c.      18 U.S.C. §§ 1595 (Trafficking Victims Protection Act); and

        d.      29 U.S.C. § 216(b) (FLSA).

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and M.D. Ga. Local Rule 3.4, because a substantial part of the practices alleged to be unlawful were committed within the jurisdiction of the Middle District of Georgia, and because Defendants William Owens and David Francisco-Baltazar reside there.

## PARTIES

### Plaintiffs

5.      Plaintiff Jose Luis Ajiatas-Solval is a Hispanic man from a rural village in Guatemala.

6.      Plaintiff Rodolfo Calderon-Gomez is a Hispanic man from a rural village in Guatemala.

7.      Plaintiff Nelson Gonzalo Carrillo-Chay is a Mayan indigenous and Hispanic man from a rural village in Guatemala.

8.      Jose Manuel Ruiz-Tum is a Mayan indigenous and Hispanic man from Guatemala.

9.      Fudencio Ruiz-Tum is a Mayan indigenous and Hispanic man from Guatemala.

10.     Plaintiffs' Fair Labor Standards Act consent forms are attached hereto as Exhibit A to this Complaint.

11.     At all times relevant to this action, Plaintiffs were H-2A workers as defined by 20 C.F.R. § 655.103(b) because they were lawfully present in the United States and authorized to perform agricultural labor of a temporary nature pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

<u>**Defendants**</u>

12.     Defendant David Francisco-Baltazar ("Francisco-Baltazar") is an individual residing in Georgia, and may be served with process at 223 3rd Avenue, Cairo, GA 39828.

13.     Like all Plaintiffs in this action, Defendant Francisco-Baltazar hails from an outlying region in southwest Guatemala. He maintains family and business relationships in that area and is acutely aware of economic conditions there, including the extreme poverty.

14.     Defendant Cisco Produce, Inc. ("Cisco Produce") is a Georgia corporation doing business in the State of Georgia. Cisco Produce was formed as a Georgia corporation on or about Feb. 29, 2012, and has a principal place of business in Cairo, Georgia.

15.     At all relevant times, Defendants have continuously been employers in agriculture, an industry affecting commerce, within the meaning of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

16.     Defendants continuously had at least 15 employees from on or about April 25, 2012 to on or about September 15, 2012.

3

17.     Defendants were employers of Plaintiffs, as defined by the FLSA, because they suffered or permitted Plaintiffs to work.

18.     At all relevant times, Defendants Cisco Produce and Francisco-Baltazar had the power to hire and fire Plaintiffs and had control over their conditions of employment.

19.     Defendants were employers as defined by the H-2A regulations, 20 C.F.R. § 655.100(b), because: Defendants had a place of business inside the United States and a means by which they could be contacted for employment; they controlled Plaintiffs' work; and upon information and belief, they possessed a valid federal Employer Identification Number.

## THE H-2A PROGRAM

20.     Agricultural employers and labor contractors in the United States may import H-2A workers if the United States Department of Labor ("U.S. DOL") certifies that (1) there are not enough U.S. workers available to perform the job and (2) the employment of H-2A workers will not adversely affect the wages and working conditions of U.S. workers who are similarly employed. 8 U.S.C. § 1101(a)(15)(H)(ii)(a); *Id.* § 1188(a)(1). These provisions, along with the regulations at 20 C.F.R. § 655.100 *et seq.* are commonly referred to as the "H-2A program."

21.     An employer seeking H-2A workers must file an application for Temporary Employment Certification with the U.S. DOL's Employment and Training Administration ("ETA"). 20 C.F.R. § 655.130.

22.     H-2A labor contractors who supply workers, as opposed to fixed site agricultural employers, are subject to additional requirements in applying for Temporary Employment Certification. *See* 20 C.F.R. §§ 655.132, 655.133.

4

23.     H-2A labor contractors are required to provide a copy of the Migrant and Seasonal

Agricultural Worker Protection Act Farm Labor Contractor (FLC) Certificate of Registration and

identify specific activities that the agent is authorized to perform, such as house or transport

workers, 20 C.F.R. § 655.133(b), and post a bond in an amount based on the number of workers

sought. 20 C.F.R. § 655.132(b)(3). For 75 to 99 workers, the bond amount is $50,000. 29 C.F.R.

§501.9(c).

24.     H-2A labor contractors are also required to provide a letter of support to the U.S.

DOL from a fixed site agricultural employer promising to employ the H-2A labor contractor for

the period of the Temporary Employment Certification and for the number of workers sought on

the Temporary Employment Certification. 20 C.F.R.§ 655.132.

25.     H-2A labor contractors must also provide the name and location of each agricultural

business it will provide H-2A workers for, the expected start and end dates of each job, and a

description of the crops and activities the workers will perform at each site. 20 C.F.R.§ 655.132.

26.     Before filing with the U.S. DOL Employment and Training Administration, the

employer must recruit U.S. workers through direct recruitment and by submitting a (Form ETA-

790) to the State Workforce Agency (SWA) servicing the employer's area. 20 C.F.R. § 655.121.

The employer's job order is circulated among nearby offices of the SWA, a process known as

"intrastate clearance." 20 C.F.R. § 655.121.

27.     The application for Temporary Employment Certification must contain a signed

statement by the employer that the terms listed therein constitute the actual terms and conditions

5

of the employment and that all the material terms and conditions of the job have been included. 20 C.F.R. § 653.501(d)(3).

28.     The employer must provide housing at no cost to H-2A workers. 20 C.F.R. § 655.122.

29.     The employer must provide housing that meets local and state standards for agricultural worker housing, or, if there are no local and state standards, it must comply with federal temporary labor camp standards. 8 U.S.C. §1188(c)(4).

30.     An employer may pay workers on a piece-rate basis, but every pay period, workers must earn, on average, at least the hourly wage specified by the regulations. If a worker's piece-rate earnings are less than the applicable hourly wage, the employer must supplement that worker's earnings to at least the level provided by the hourly wage. 20 C.F.R. § 655.122(l)(2)(i).

31.     To pay workers for a particular crop activity at a piece rate, an employer  must submit the proposed piece rate to the U.S. DOL for approval and must disclose the piece rates in the job order.

32.     The job order terms must comply with 20 C.F.R. part 653, subpart F and 20 C.F.R. § 655.122. *Id.* § 655.121(a)(3). As part of its application for foreign workers, the employer must certify to the U.S. DOL, under penalty of perjury, that the job positions are and have been open to U.S. workers. 20 C.F.R. § 655.135(a).

33.     The job order remains in circulation until the first fifty (50) percent of the work contract period elapses. During this time "the employer must provide employment to any qualified, eligible U.S. worker who applies" for the job. 20 C.F.R. § 655.135(d).

6

## STATEMENT OF FACTS

### *APPLICATION FOR TEMPORARY EMPLOYMENT CERTIFICATION*

34.     Defendant Francisco-Baltazar worked as a farm labor contractor and held a license for farm labor contracting issued by the U.S. DOL, License No. C-04-064323-B-13-R. Under the terms of this license, Defendant Francisco-Baltazar was not authorized to transport or house agricultural workers. This license expired February 28, 2013.

35.     Upon information and belief, Defendant Francisco-Baltazar claimed to the U.S. DOL to be an Agricultural Employer with crops to avoid the provisions of the H-2A labor contractor requirements.

36.     William Owens and Francisco-Baltazar represented to the U.S. DOL for purposes of obtaining Temporary Employment Certification that Owens had leased to Defendant Cisco Produce 80 acres of farmland at or near 1577 Ridge Road, Cairo.

37.     Owens and Francisco-Baltazar represented to the U.S. DOL for purposes of obtaining Temporary Employment Certification that Defendant Cisco Produce would lease 10 mobile homes at 1577 Ridge Road, Cairo to house the agricultural workers.

38.     The representations described above allowed Defendant Francisco-Baltazar to apply for Temporary Employment Certification with the U.S. DOL as an agricultural employer under the name "Cisco Produce," avoiding H-2A labor contractor requirements including bond, licensing, the employer letter, and a listing of all work sites and corresponding work periods.

39.     Upon information and belief, Defendant Francisco-Baltazar would not have been able to obtain U.S. DOL approval as an H-2A labor contractor.

7

40.      Defendant Francisco-Baltazar submitted a job order with the application for Temporary Employment Certification listing the employer name as David Francisco Cisco Produce, Inc., and requesting 60 workers for the period from March 1, 2012 through December 31, 2012. The job order, GA 7999538,  is attached hereto as Exhibit B to this Complaint.

41.     The "Employer's Certification" and "Employer Assurance" sections of the job order were signed by Defendant Francisco-Baltazar on January 19, 2012.

42.     The job order promised 40 hours a week of work picking squash, tomatoes, blueberries, and cabbage at $9.39 per hour, and it promised housing at no cost to H-2A workers.

### *RECRUITMENT*

43.     Through agents in Guatemala, Defendants recruited Plaintiffs from Guatemala.

44.     Defendant Francisco-Baltazar recruited impoverished Guatemalan nationals to work as agricultural laborers in the United States.

45.     Defendants' agent in Guatemala told Plaintiffs that to get a visa to work in the United States, they had to pay Defendant Francisco-Baltazar an initial recruitment fee in Guatemalan quetzales that exceeded $500.

46.     After Plaintiffs paid an initial recruitment fee, Defendants, through their agents, demanded payment of additional fees.

47.     Plaintiffs, lacking money to pay for successive rounds of fees, a fact known or which should have been known to Defendants, took out substantial loans to pay the increasing fees.

48.     When Plaintiff Jose Manuel Ruiz-Tum asked to discontinue the process due to the increasing fees, an agent of Defendant told him the agent would not refund any money already

spent on the process. Because of the debt he had already incurred, Plaintiff felt pressured to pay the next rounds of fees, since the amount of his debt was so in excess of his Guatemalan earning capacity that he would have been financially ruined if he did not obtain U.S. employment.

49.    To comply with Defendants' hiring process, Plaintiffs traveled from their homes to Guatemala City at their own expense.

50.    When Plaintiffs attended their visa interviews at the U.S. Embassy in Guatemala City, Defendants' agents instructed them to lie when asked if they had paid any recruitment fees.

51.    When Plaintiffs arrived at the airport in Guatemala, they learned for the first time that the plane tickets purchased by Defendants were only one-way, and that they would not be allowed to board the plane without a return ticket. Having incurred substantial debts to come, Plaintiffs felt pressured by this debt to spend an additional 3,000 Guatemalan quetzales, about $394 U.S. dollars, for return travel.

52.    In all, Plaintiffs incurred expenses in excess of $2,000, before interest, to obtain H-2A visas and travel to the United States to work for Defendants. This amount exceeds the annual income of Plaintiffs in Guatemala.

53.    The expenditures set out in paragraphs 45, 47 through 49, 51, and 52 were primarily for the benefit of the Defendants within the meaning of 29 C.F.R. §§ 531.32(c) and 778.217.

54.    The expenditures set out in paragraphs 45, 47 through 49, 51, and 52 were made before receipt of Plaintiffs' first paychecks.

55.     Defendants required that Plaintiffs pay substantial recruitment fees to secure the U.S. jobs, knowing that they were impoverished and likely would have to borrow the money using their family land as collateral to secure the substantial debt.

56.     Defendants knew that Plaintiffs had incurred high debts to secure the U.S. jobs, but threatened to deport Plaintiffs before they could recoup the costs, knowing that they and their families would face serious economic harm as a direct result of the debts they incurred to comply with the recruitment scheme.

### ARRIVAL, HOUSING AND WORKING CONDITIONS

57.     Upon the arrival of Plaintiffs, Defendants and their agents arranged transportation for Plaintiffs from the airport in Miami, Florida to Cairo, Georgia.

58.     Defendant Francisco-Baltazar instructed Plaintiffs Ajiatas-Solval, Calderon-Gomez, Jose Manuel Ruiz-Tum, and Fudencio Ruiz-Tum to begin working within hours of their arrival in Cairo, Georgia, even when Plaintiffs asked for more time to rest.

59.     Plaintiffs' housing was located less than one mile from Owens' fields.

60.     During the squash harvest, Owens regularly visited his fields in the morning and afternoon, at times conferring with Defendant Francisco-Baltazar.

61.     At times, Owens oversaw field activities.

62.     After their arrival in the United States, Defendant Francisco-Baltazar told workers that if they wished to end their employment and leave, they would have to pay an additional $1,000 U.S. dollars.

63.     Once all H-2A workers had arrived, about 42 workers were forced to live in overcrowded housing in three trailers.

64.     Plaintiffs' bedding consisted of a wooden platform with a thin foam mat.

65.     Plumbing in the trailers was broken, so that when Plaintiffs used the toilet, raw sewage leaked below the trailer.

66.     Plaintiffs were not provided access to a laundromat or washing machines, and washed clothes by hand.

67.     Owens owned the land where the mobile homes were located and he or his family members owned or controlled the mobile homes and improvements.

68.     On information and belief, Owens' own home was near the housing site, such that he regularly observed the condition of the mobile homes and H-2A workers living in them.

69.     Owens and Defendants knew or should have known that Plaintiffs were housed in overcrowded conditions in trailers with defective plumbing and that each trailer was approved for a maximum of 10 workers.

70.     When Plaintiffs and other Guatemalan H-2A workers raised concerns with Defendant Francisco-Baltazar about the sewage seeping under the trailer, they were told to stop complaining or they would be returned to Guatemala.

71.     Throughout the work period, Defendant Francisco-Baltazar routinely threatened Plaintiffs and other workers with arrest and deportation should they attempt to stop working for Defendants.

11

72.     Repeatedly, Defendant Francisco-Baltazar told the H-2A Guatemalan workers, including Plaintiffs, that if they did not want to keep on working, they should get a noose and hang themselves because it was not worth it to live.

73.     Defendant Francisco-Baltazar told Plaintiff Jose Manuel Ruiz-Tum that if he did not wish to be there, Defendant Francisco-Baltazar himself would bring him a noose so that Plaintiff could hang himself.

### PAYMENT

74.     Defendant Francisco-Baltazar informed Plaintiffs that the method of payment was changed to a piece rate basis, offering $1 per bucket of squash.

75.     Thereafter, Plaintiffs were paid on a piece-rate basis for their work, such that they were paid according to the number of crops they harvested, without regard to the number of hours they worked.

76.     Plaintiffs' weekly piece-rate earnings for their work fell below the applicable federal minimum wage.

77.     Plaintiffs did not receive payment for all compensable hours worked as required by the Fair Labor Standards Act and their employment contracts.

78.     Defendants did not supplement Plaintiffs' weekly earnings for their work to ensure that Plaintiffs' wages met the applicable hourly wage rates.

79.     Defendants failed to reimburse Plaintiffs during the first workweek for the costs described in paragraphs 45, 47 through 49, 51, and 52, resulting in Plaintiffs' first week wages falling well below the minimum wage.

12

80.     When Plaintiffs joined with other Guatemalan H-2A workers who demanded pay for their hours worked, Defendant Francisco-Baltazar responded by taking adverse employment action against them, threatening them with arrest and deportation.

81.     When Plaintiffs went with co-workers to tell Defendant Francisco-Baltazar they were not earning enough money to repay the debts they had incurred to travel to the U.S. to work, Defendant Francisco-Baltazar told them that if they did not continue working for Defendants, he would report them to immigration officials.

82.     Defendants failed to make, keep, preserve, and retain accurate employment records as required by the FLSA, 29 U.S.C. § 211(c).

83.     During the period between February and August 2012, the Georgia Department of Labor (the State Workforce Agency) referred 361 U.S. workers to Defendant Cisco Produce for employment in agricultural work.

84.     The workers referred by the State Workforce Agency were of U.S. national origin and non-Hispanic.

85.     Upon information and belief, Defendants failed to hire any of the U.S. workers referred by the State Workforce Agency during that period.

### *THREATS*

86.     In or about May 2012, Plaintiff Carrillo-Chay left the housing site after work hours. Defendant Francisco-Baltazar instructed those transporting Plaintiff Carrillo-Chay to return him or face arrest.

13

87.    Defendant Francisco-Baltazar later entered a trailer and told Plaintiff Ajiatas-Solval and other H-2A workers gathered there that he had cameras installed around the trailers and would watch them should they attempt to leave the housing site.

88.    Defendant Francisco-Baltazar also threatened that if the H-2A workers tried to leave, he would call the police and/or immigration authorities, with whom he had contact, to have them arrested and deported.

89.    After this incident, Defendant Francisco-Baltazar banned Plaintiffs and other workers not only from leaving but also from receiving guests at the housing site without his permission.

90.    Defendant Francisco-Baltazar threatened Plaintiffs and other workers that if they tried to leave, he would file a lawsuit against them, and they would be jailed both in the United States and in Guatemala.

91.    Defendants subjected Plaintiffs to intolerable working conditions that resulted in their constructive discharge.

92.    Plaintiffs lost the benefit of their employment contract because conditions were so unbearable that they were constructively discharged.

93.    After Plaintiff Carrillo-Chay escaped employment with Defendants, an associate of Defendants demanded payment of $1,000, on threat of reporting him to the police and/or immigration authorities.

94.    Plaintiff Carrillo-Chay, afraid of being deported to Guatemala before being able to repay his debts, paid $500 in response.

14

95.     Defendants subjected Plaintiffs to disparate terms and conditions of employment, including unlawfully low wages, false claims of debt, illegal wage deductions, significant gaps in work, and uninhabitable housing.

96.     When Plaintiffs participated in complaining about work conditions, Defendant Francisco-Baltazar took adverse employment action against them by threatening consequences based on their Guatemalan national origin.

## ADMINISTRATIVE PROCEEDINGS

97.     Within one hundred and eighty (180) days of the discriminatory action taken against them by Defendants, Plaintiffs Ajiatas-Solval and Calderon-Gomez filed charges of discrimination with the EEOC, alleging class-wide discrimination.

98.     Plaintiffs Carrillo-Chay, Jose Manuel Ruiz-Tum, and Fudencio Ruiz-Tum assert claims based on the timely filing of a charge alleging class-wide discrimination with the EEOC by Plaintiff Calderon-Gomez.

99.     On September 30, 2014, the EEOC issued a right to sue letter to Plaintiffs Ajiatas-Solval and Calderon-Gomez.

## CLAIMS FOR RELIEF

### COUNT I
**FOR VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT -- FORCED LABOR**

100.     This Count sets forth a claim by Plaintiffs against all Defendants for violations of the forced labor provision of the Trafficking Victims Protection Act of 2008, 18 U.S.C. § 1595.

101.     Plaintiffs incorporate by reference the allegations contained in paragraphs 34 to 94.

15

102.    Defendants Francisco-Baltazar and Cisco Produce recruited and transported Plaintiffs into the United States for the purposes of obtaining their labor through fraud, force and coercion.

103.    As set forth above in paragraphs 34 to 41, 50 to 52, 55, 56, 58, 62, 69 to 73, 80, 81, and 86 to 94, Defendants Francisco-Baltazar and Cisco Produce obtained Plaintiffs' labor:

      a.  by means of abuse and threatened abuse of law or legal process, and

      b.  by means of a scheme intended to cause Plaintiffs to believe that, if they did not perform the labor as required, they would suffer serious harm.

104.    Defendant Francisco-Baltazar indicated to Plaintiffs that they would suffer financial harm, loss of liberty, and suggested to some workers that they should hang themselves should they choose not to perform the work as detailed in paragraphs 72 and 73.

105.    Defendant Francisco-Baltazar's actions detailed in this Count were taken knowingly within the meaning of 18 U.S.C. § 1590.

106.    Defendants knowingly benefited financially from participation in a venture which they knew or should have known was engaged in the acts set forth above in paragraphs 36 to 39, 58, 62, 69 to 73, and 86 to 94.

107.    Plaintiffs suffered damages, including the loss of the value of their contractual promises and emotional distress.

## COUNT II
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
DISCRIMINATORY TERMS AND CONDITIONS
AND HOSTILE WORK ENVIRONMENT**

108.    This Count sets forth a claim for relief by Plaintiffs for Defendants' violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* on the basis of national origin, race, and retaliation.

109.    Defendants engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Plaintiffs to discriminatory terms and conditions of employment because of their Hispanic and/or Mayan race and/or Guatemalan national origin, as alleged in paragraphs  55, 56, 58, 62 to 66, 71 to 79, 86 to 90, 93 and 95.

110.    Defendants engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Plaintiffs to harassment and/or a hostile work environment because of their Hispanic race and/or Guatemalan national origin, as alleged in paragraphs 55, 56, 58, 62 to 66, 71 to 79, 86 to 90, 93 and 95.

111.    The hostile work environment became so intolerable that Plaintiffs were forced to flee and were thereby constructively discharged, as set forth in paragraphs 91 and 92.

112.    The effect of the practices complained of above has been to deprive Plaintiffs of equal employment opportunities and otherwise adversely affect their employment status because of their race and/or national origin.

113.    The unlawful practices complained of above in paragraphs 55, 56, 58, 62 to 66, 71 to 79, 86 to 90, 93 and 95 were and are intentional.

17

## COUNT III
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – RETALIATION

114.     This Count sets forth a claim for relief by Plaintiffs for Defendants' violation of the retaliation provision of Title VII.

115.     Plaintiffs complained about their wages and terms and conditions of employment, as detailed in paragraphs 70, 71, 80, 81, and 96.

116.     Plaintiffs' actions constituted protected activities, as they reasonably believed Defendants to be unlawfully discriminating against them.

117.     Defendants responded to Plaintiffs' complaints with threats of arrest and deportation that materially affected Plaintiffs' employment.

118.     Plaintiffs suffered damages, including when Defendants subjected Plaintiffs to adverse employment actions, including, without limitation, harassment, threats, denial of work, and a hostile work environment, as alleged in paragraphs 70, 71, 80, 81, and 96.

## COUNT IV
## FAIR LABOR STANDARDS ACT

119.     This Count sets forth a claim by Plaintiffs for damages for Defendants' violations of the FLSA pursuant to 29 U.S.C. § 216(b).

120.     As detailed in paragraphs 75 to 78 above, Defendants failed to pay Plaintiffs at least the required average minimum hourly wage for every compensable hour of labor performed in a workweek, as required by 29 U.S.C. § 206(a).

121.     The violations of the FLSA resulted, in part, from Defendants' failure to reimburse expenses as detailed in paragraphs 45 through 52 above, which Plaintiffs incurred primarily for

18

the benefit or convenience of Defendants prior to Plaintiffs' first week of work. When these expenses were subtracted from the Plaintiffs' first week's pay, as required by law, Plaintiffs' earnings fell well below the required average minimum hourly wage for that pay period, and were negative.

122.    The violations set forth in this Count resulted, in part, from Defendants' practice of paying Plaintiffs based on the quantity of the produce harvested without regard to the number of hours the Plaintiffs worked, as detailed in paragraphs 74 and 75 above.

123.    The violations set forth in this Court also resulted, in part, from Defendants' failure to record and pay Plaintiffs for all hours worked as described in paragraphs 75 through 78 and 82, above.

124.    Pursuant to 29 U.S.C. § 216(b), as a result of Defendants' violations of the FLSA set forth in this Count, Plaintiffs are entitled to recover the amount of their unpaid wages and an equal amount as liquidated damages for each workweek in which they were suffered or permitted to work at Defendants' operations and during which they earned less than the applicable minimum wage.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court accept jurisdiction of this case and grant them the following relief:

(a)    Under the TVPA Counts:

      1.    Declare that Defendants violated the TVPA as specified above in paragraphs 100 to 107;

19

2.     Pursuant to 18 U.S.C. §1595(a), grant judgment against Defendants and in favor of each Plaintiff in the amount of each Plaintiffs' compensatory damages in amounts as proved at trial, including the promised contractual hourly wage for Plaintiffs' work, and damages for the emotional harm Defendants' violations caused;

3.     Pursuant to 18 U.S.C. § 1595(a), order Defendants to pay Plaintiffs punitive damages for their intentional violations, including those specified in paragraphs 102 to 106; and

4.     Award Plaintiffs attorneys' fees pursuant to 18 U.S.C. § 1595.

(b)     Under the Title VII Counts:

1.     Order Defendants to pay Plaintiffs backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices;

2.     Order Defendants to compensate Plaintiffs for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 109 to 113 and 115 to 118, including recruitment fees, relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial;

3.     Order Defendants to compensate Plaintiffs for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 109 to 113 and 115 to 118, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial;

20

4.      Order Defendants pay Plaintiffs punitive damages, in amounts to be

determined at trial, for Defendants' malicious or reckless conduct, described in

paragraphs 109 to 113 and 115 to 118; and

5.      Award Plaintiffs its costs of this action.

(c)      Under the FLSA Count:

1.      Declare that Defendants have willfully violated the FLSA as specified above in

paragraphs 119 through 123;

2.      Grant judgment against Defendants and in favor of each Plaintiff in the amount

of each Plaintiffs' unpaid wages as proved at trial, plus an equal amount in

liquidated damages, pursuant to 29 U.S.C. § 216(b); and

3.      Award Plaintiffs attorneys' fees pursuant to 29 U.S.C. § 216(b).

Respectfully submitted this 23 day of December, 2014

/s/ Dawson Morton
Dawson Morton
Georgia Bar No. 525985
Laura Rivera
Georgia Bar No. 143762
Lisa Krisher
Georgia Bar No. 429762
Georgia Legal Services Program
104 Marietta Street NW, Suite 250
Atlanta, GA  30303
Phone: (404) 463-1633
Fax:    (404) 463-1623
*Attorneys for Plaintiffs*